1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2

UNITED STATES OF AMERICA,      )     **Case No. 3:15-CR-0496-L**

3
                               )
        Plaintiff,             )

4
                               )     Dallas, Texas
v.                             )     September 7, 2016

5
                               )     9:00 a.m.
SK LABORATORIES, INC. (06)     )

6
AND SITESH PATEL (07),         )     MOTION TO MODIFY CONDITIONS
                               )     OF RELEASE [133]

7
        Defendants.            )
_____)

8

9
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PAUL D. STICKNEY,
UNITED STATES MAGISTRATE JUDGE.

10

APPEARANCES:

11

For the Government:        David O'Donald Sullivan

12
                           Patrick Raymond Runkle
                           UNITED STATES DEPARTMENT OF JUSTICE

13
                           CONSUMER PROTECTION BRANCH
                           P.O. Box 386

14
                           Washington, DC  20044-0386
                           (202) 514-0516

15

For Defendant SK           Joseph Mark McMullen

16
Laboratories, Inc.:        LAW OFFICES OF JOSEPH M. MCMULLEN
                           225 Broadway, Suite 1460

17
                           San Diego, CA  92101
                           (619) 501-2000

18

For Defendant Patel:       Patrick Quinn Hall

19
                           Law Offices of Patrick Q. Hall
                           401 B Street, Suite 2220

20
                           San Diego, CA  92101
                           (619) 268-4040

21

For Defendant Patel:       Chris Niewoehner

22
                           STEPTOE & JOHNSON, LLP
                           115 South LaSalle Street, Suite

23
                             3100
                           Chicago, IL  60603

24
                           (312) 577-1240

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Recorder:            Lavenia Price
                           UNITED STATES DISTRICT COURT
                           1100 Commerce Street, Room 1549
                           Dallas, TX  75242-1003
                           (214) 753-2168

Transcription Service:     Kathy Rehling
                           311 Paradise Cove
                           Shady Shores, TX  76208
                           (972) 786-3063

                    Proceedings recorded by electronic sound recording;
                      transcript produced by transcription service.

```
 1              DALLAS, TEXAS - SEPTEMBER 7, 2016 - 9:04 A.M.

 2              THE COURT:  Court is in session in the matter of

 3    United States of America v. SK Laboratories and Sitesh Patel,

 4    3:15-cr-496-L.  Who's here for the Government?

 5              MR. RUNKLE:  Patrick Runkle from the Consumer

 6    Protection Branch of the Department of Justice, Your Honor.

 7              MR. SULLIVAN:  David Sullivan from the same, Your

 8    Honor.

 9              THE COURT:  Thank you.  For the Defense?

10              MR. HALL:  Patrick Hall on behalf of Sitesh Patel,

11    Your Honor.  He's seated here in the first row, with the

12    Court's permission, if that's acceptable.

13              THE COURT:  Yes, that's fine.

14              MR. MCMULLEN:  Good morning, Your Honor.  Joseph

15    McMullen for SK Laboratories.

16              THE COURT:  All right.  Thank you.  Is the Government

17    ready to proceed?

18              MR. RUNKLE:  Yes, we are, Your Honor.

19              THE COURT:  Defense?

20              MR. HALL:  Yes, Your Honor.

21              MR. MCMULLEN:  Yes, Your Honor.

22              THE COURT:  I'm happy to hear from you.

23              MR. RUNKLE:  Thank you, Your Honor.  And we really

24    appreciate the opportunity and your indulgence in having this

25    hearing today.
```

1            THE COURT:  Yes, sir.

2            MR. RUNKLE:  Now, what's facing the Court here is a

3    simple question that can't and shouldn't be obscured by the 700

4    pages of filings that the Defendants filed.  And none of those

5    pages of filings answer the real question here, and that is,

6    should the Defendant that's implicated in three different

7    clusters of injuries from three different dietary supplements,

8    facing decades in federal prison for hurting people, be allowed

9    to continue operations just because they say he's a nice guy?

10   The answer is of course not.  In their filings, they complain

11   over and over again that the Government is misusing the bond

12   statute, could file an injunction action, and all sorts of

13   other things about the improper misuse of the conditions of

14   release.  But how is it misuse of the bond statute to try to

15   protect the public from two indicted defendants who are

16   implicated in three and counting different clusters of

17   illnesses linked to their products?  It's not a misuse of the

18   statute.  In fact, it's exactly what Congress intended and it's

19   exactly why the bail statute exists.

20       Congress provided this remedy to the Government and the

21   public, and it would have been easy for these Defendants not to

22   get themselves subjected to conditions of release.  They could

23   have not committed federal crimes, they could have not been

24   indicted twice, they could have made sure that their

25   supplements were actually safe before they put them out, and

1    the Bail Reform Act's conditions of release wouldn't be a

2    problem for them.

3        Now, the extraordinary amount of money -- and SK Labs, by

4    our calculations, made something like $89 million during its

5    relationship with USPlabs up until 2013 -- the extraordinary

6    amount of money that they made selling these illegal products

7    has allowed them to construct a cocoon of high-priced lawyers

8    and experts who tell them what they want to hear.  That's their

9    right, of course, but it's my obligation to bring a little

10   reality into this mix.

11       They have been able to avoid having a single trial in any

12   of the dozens of civil cases against them for the injuries that

13   their products caused mostly by arguing that those cases should

14   be stayed pending this one.  Now, that's the only thing they

15   can do.  They can't bear actually putting this evidence in

16   front of a fact finder and putting the victim in front of a

17   fact finder and having the fact finder decide whether their

18   substances actually were dangerous.  The fear that somebody

19   will see through this nonsense is actually palpable.  It would

20   be like a defendant who was caught with bags of white powder

21   who had been caught with bags of white power before coming in

22   here and saying the Government hadn't proven by clear and

23   convincing evidence that the powder had hurt anyone, despite

24   the fact that it seems to be showing up with people who, you

25   know, had serious injuries.

1      It's the exact same case except it's even more galling

2 because it's trading in the same stock that they've traded in

3 for eight years.  They're the ones who chose to put untested

4 substances in the market that had never been fed to the public

5 before in the quantities that they had fed them to -- that they

6 put them in the products.  And after they did that and after

7 people got hurt, it's time not to actually figure out what

8 happened but it's time to instead spend the millions of dollars

9 that they made selling those products attacking the people who

10 dare question them.

11      Now, SK Labs, which has no Fifth Amendment right to remain

12 silent in this context, has refused to explain why it still

13 employs a vice-president who faces literally decades in prison

14 in two different felony cases for distributing illegal,

15 dangerous substances using fraud.  The reason it hasn't sought

16 to explain that is, when you read the conduct that SK Labs has

17 been involved in, when you read the emails that are quoted in

18 these indictments and that I've attached to the motion that I

19 filed, there's no excuse.  There's no excuse for lying and

20 cheating and selling products that hurt people.  And the emails

21 are as clear as day.  It's wink-wink.  It's nod-nod.  It's LOL.

22 It's, oh, we'll just sell whatever.

23      And remarkably, if that weren't enough, SK Labs did it

24 three separate times.  And yet they haven't told you about a

25 single product they're making now or whether the manufacturers

1 that they make those products for now have received any adverse

2 event reports for those products or anything else.

3          THE COURT:  Let me focus you in on why we're here

4 today.

5          MR. RUNKLE:  Sure.

6          THE COURT:  We're here today because you're alleging

7 that there's a violation of his pretrial release in the sense

8 that he's got this new indictment pending.  That's why I set

9 this hearing, --

10          MR. RUNKLE:  Uh-huh.

11          THE COURT:  -- because I was concerned, if he was

12 involved in the same sort of activity on the underlying

13 charges, that he would be subject to revocation of his release

14 or additional conditions being imposed if he was out committing

15 the same sort of offenses.

16          MR. RUNKLE:  Uh-huh.

17          THE COURT:  But in the responses, I see that the

18 offenses that he's charged with in the other district are

19 offenses that occurred in the same time frame as the underlying

20 indictment and nothing new since I've had him on release.  Can

21 you address that?

22          MR. RUNKLE:  Well, I certainly can address that.

23 First of all, I think that what we've asked for here is not a

24 revocation of his release.  What we've asked for is an

25 additional reasonable condition, given the fact that there are

1    -- that there was this additional indictment that now reveals

2    that the same conduct that he committed in this case he

3    committed in other cases.  And in fact, --

4            THE COURT:  In the same time frame, right?

5            MR. RUNKLE:  Well, --

6            THE COURT:  Why didn't you ask for the revocation of

7    his pharmaceutical license and these other conditions at the

8    original time of the hearings?

9            MR. RUNKLE:  Well, I'm getting there.  The answer to

10   that question is, first of all, it wasn't an indicted case at

11   that time.  I was generally aware of the fact that there was

12   another investigation but I wasn't aware of the specific

13   conduct.  In addition, I didn't think it was my place to come

14   in here and talk about a grand jury investigation occurring in

15   another district that hadn't yet led to an indictment.  That's

16   the first problem.

17       The second reason that that's -- that I didn't ask for

18   additional conditions at the time was because we didn't believe

19   that SK Labs and USPlabs' ongoing operations would present

20   really substantial issue at that time.  The reason was, as Your

21   Honor may recall, there was a representation made to this Court

22   prior to Mr. Patel appearing for his initial appearance, I

23   believe, that USPlabs was winding down its business or was

24   going to wind down its business.  At that time, at least,

25   USPlabs accounted for 70 to 80 percent of SK Labs' business,

 1  and so the two are sort of tied at the hip.  Frankly, I just

 2  didn't believe that the Defendants could continue operations,

 3  given the indictment and given the representations that they

 4  made to this Court, but they have.  And in fact, USPlabs never

 5  intended to wind down its business because they were releasing

 6  new products almost immediately after the indictment.

 7      Now, the last reason is actually the most important.  The

 8  last reason that I didn't ask for those conditions is that I

 9  didn't learn until a few weeks ago that -- and because that

10  indictment doesn't actually charge it, but in that case there

11  are severe injuries that resulted from those products being

12  distributed.  It's not an element of the crime because the

13  products were illegal in any -- you know, coming and going,

14  they're illegal, and because they were misrepresented as

15  dietary supplements when they aren't.  But in that case, when I

16  started digging into the record of that case, it turns out that

17  there's a company in Virginia called Competitive Edge Labs

18  that's Sitesh Patel conspired with in a variety of different

19  ways to sell these prohormone substances.  That company chose

20  to bankrupt itself to pay settlements to all the people who

21  were injured by its products.

22      So the concept that there were no injuries from that case,

23  I -- what I knew about that case, I didn't know there were any

24  injuries.  The FDA has --

25          THE COURT:  But don't you allege injuries on the

1   USPlabs case?

2           MR. RUNKLE:  Yes.  There are injuries alleged in the

3   USPlabs case.

4           THE COURT:  Similar?

5           MR. RUNKLE:  It's similar.  It's a very similar

6   product.

7           THE COURT:  Right.  So we knew that at the time I set

8   his original conditions of release.

9           MR. RUNKLE:  Right, but what we didn't -- there's

10   another -- there's one more, there's one more factor to

11   consider.  In this case, there was a procedure employed because

12   of the Ninth Circuit's search warrant procedures where we

13   weren't permitted to look through the SK Labs search warrant

14   materials for evidence of other crimes.  We had to do a

15   relevance review at the beginning to see whether, you know, to

16   see whether the conduct fell within the scope of our search

17   warrant.  That's a procedure that the Central District of

18   California employed.  So there was no way for us to understand

19   the scope of that conduct or to look into the dangerousness of

20   the other conduct.

21       We understand that the aegeline -- that the, I'm sorry,

22   that the DMAA product is no longer on the market, that the new

23   OxyElite Pro product that hurt people also is not on the market

24   right now.  But as you'll see, even, we have witnesses to

25   present today.  You'll see that there is a cognizable and very

1  real danger that what the Defendants did before they will do

2  again if they remain in operation, because they haven't

3  explained to the Court how they came to use these dangerous

4  substances in the first place and they keep insisting to the

5  Court --

6       THE COURT:  Shouldn't that be reserved for the trial

7  in this matter?

8       MR. RUNKLE:  It will be re... that issue, you know, as

9  a factual matter, can be reserved for the trial, but we brought

10 witnesses today to allow the Court to get some context, not

11 just from paper but from actually -- to understand what -- the

12 conduct involved and how consumers were affected by this

13 conduct and whether it seems like a good idea for this conduct

14 to be continuing while they're pending trial, considering that

15 they're putting out new products.

16     Part of the way this industry operates is you have to find

17 a new product.  You have to find a new substance to put in a

18 product, right?  These Defendants refuse to admit that any of

19 these new substances that they went out and found actually hurt

20 anybody.  The fact that they won't admit that or can't

21 recognize that shows that they won't be able to appreciate the

22 danger of any of the products that they're putting out now.

23 And there are additional complaints that have come in on the

24 current products that they're making and that they're putting

25 out now.  Now, it's not at the level of the clusters of

1   injuries that we saw before, but there is a complaint that the

2   FDA received, I believe, in 2015.  Two complaints about Jack3d,

3   the current version of Jack3d, caused, you know, heart

4   palpitations.  Somebody collapsed while they're running.  Those

5   kind of things just show that these products are not inherently

6   safe products.

7       And for the Court to say and for -- especially for the

8   Government to say, when we're prosecuting this case, oh, it's

9   okay, you can get indicted, you know, any number of times for

10  any number of conduct and we're not going to do anything about

11  that, we're not going to say that reasonable conditions of

12  release should be applied to you in terms of you should not be

13  making additional new products that go out in the market, you

14  should not be making products at all that people are going to

15  consume, given the conduct that we've seen in the past

16  indictments, that's -- that's where we are today.  And so if

17  Your Honor would indulge me, I have three witnesses to put on.

18          THE COURT:  Okay.

19          MR. RUNKLE:  Okay.

20          MR. HALL:  For the record, Your Honor, we have not

21  received any type of witness statements or *Jencks Act* material

22  with respect to this, and this is actually news to us.

23          THE COURT:  Again, it's not the trial.

24          MR. RUNKLE:  But *Jencks* doesn't --

25          THE COURT:  We're not trying this case here.

1            MR. RUNKLE:  *Jencks* doesn't apply in a pretrial.

2            MR. HALL:  I believe 26.2 does, though, Your Honor.

3            MR. RUNKLE:  The Government calls Ms. Yamira Quinones.

4        THE COURT:  Will you raise your right hand?

5      (The witness is sworn.)

6            THE COURT:  Be seated, please.  Would you state your

7    name for the record?

8            THE WITNESS:  Y-A-M-I-R-A.  Last name Q-U-I-N-O-N-E-S.

9    Yes.

10                        DIRECT EXAMINATION

11   BY MR. RUNKLE:

12   Q    Good morning, Ms. Quinones.

13   A    Good morning.

14   Q    How are you doing this morning?

15   A    I'm doing well.  How are you?

16   Q    Good.

17   A    Good.

18   Q    Could you -- well, first, I'm going to ask you a few

19   questions about your background.  Where are you from?

20   A    I'm here from Dallas.  I was born here and I've been here

21   --

22   Q    Okay.

23   A    -- all my life.

24   Q    What's your educational background?

25   A    I did graduate high school.  I went to a technical school

Quinones - Direct                              14

1   for my certification for medical assistant.  And I am currently

2   attending community college at Mountain View in Oak Cliff for a

3   degree in education.

4   Q   Okay.  Where do you work?

5   A   I work for Baylor Scott & White for a pediatric center on

6   North Central Expressway.

7   Q   I see you're in scrubs today.

8   A   Yes.

9   Q   Did you go to work?

10  A   Yeah, I'm going to work after here.

11  Q   Well, thanks for coming.

12  A   Thank you.

13  Q   Did you ever become familiar with a company called USPlabs?

14  A   Yes, I did.

15  Q   And how did you encounter USPlabs?

16  A   I took one of their products.

17  Q   When did that happen?

18  A   Summer of 2013.

19  Q   And where did you buy the product?

20  A   I bought it at GNC in Irving Mall.

21  Q   What product did you buy?

22  A   The OxyElite Pro.

23  Q   Why did you buy it?

24  A   Because I wanted to lose weight and it had said that it was

25  a fast method to lose weight.

Quinones - Direct                                    15

1   Q    Okay.  Did you take it?

2   A    Yes, I did.

3   Q    Did you take any other dietary supplements?

4   A    No, I did not.

5   Q    Are you a generally healthy person?

6   A    Very healthy, yes.

7   Q    So did something happen to you around the beginning of

8   2014?

9   A    Yes.  I had liver failure.

10            THE COURT:  You had what failure?

11            THE WITNESS:  Liver failure.  In February.

12   BY MR. RUNKLE:

13   Q    What happened?  How did that happen?

14   A    Well, I started having dark urine and feeling fatigued.

15   And I thought it was a bladder infection because I've always

16   been healthy, I never thought anything of it.  And one day my

17   eyes turned yellow.  They were fully blown yellow.  And I ran

18   -- I was at work and I drove myself to Las Colinas Medical

19   Center and they rapidly got a sample of urine and they asked me

20   all these questions.  Are you -- you know, do you use drugs?

21   Are you, you know, do you have sex with multiple partners?  I'm

22   like, no, I don't -- thank you.  I was like, I don't.  And so

23   they did all these labs and then my LFTs were elevated.  They

24   were above 2,000.  And they were like, well, you know, they

25   checked --

1           MR. HALL:  Your Honor, with respect, I believe this is

2    hearsay as to what these tests are.

3           THE COURT:  Hearsay is admissible at these

4    proceedings.  Thank you, sir.

5           THE WITNESS:  So they tested me.  They were like, do

6    you have sex with multiple partners?  You know, do you do

7    drugs?  And I'm like, no, sir, I don't.  They did multiple

8    tests to check me for Hepatitis A, B, C, every type of

9    hepatitis.  Everything came back negative.  So, since my LFTs

10   were very elevated, I had to -- they admitted me in.  It was

11   Valentine's, to be exact.  I stayed there for a day.  I stayed

12   there for -- until -- I was admitted Friday.  I stayed -- I got

13   out on Sunday.  Did all these labs.  And I had told them I had

14   taken these pills.  So when he came back, they did all these

15   lab results and they're like, that's what caused you to have,

16   you know, to have liver failure.  Your LFTs were so elevated.

17          MR. HALL:  Your Honor, with respect, I recognize

18   hearsay is admissible on this, but she hasn't identified who

19   the speaker is, she hasn't identified their qualifications.  I

20   would ask that the Court -- I'd object as some lack of

21   foundation on this, but I would also object to these

22   conclusions that are being reached.  Because, as Your Honor

23   understands, this is a hotly-contested issue, --

24          THE COURT:  Yes.

25          MR. HALL:  -- and they're introducing it through the

Quinones - Direct                         17

1  hearsay of this particular witness, without giving us notice or

2  an opportunity to address the underlying conclusions.

3       THE COURT:  Thank you, sir.  It's overruled.  You can

4  continue.

5  BY MR. RUNKLE:

6  Q    So, your doctor, what was -- do you remember his name?

7  A    Dr. Fernandez.

8  Q    Okay.  He's --

9  A    He's a GI at Las Colinas.

10  Q    He's an emergency room physician at --

11  A    Yes, sir, as well.

12  Q    -- Las Colinas Medical Center?

13  A    Yes, sir.

14  Q    Okay.  And he believed that OxyElite Pro caused the liver

15  failure?

16  A    Yes.  Definitely.

17  Q    Okay.  And there were no other risk factors that he could

18  identify?

19  A    No other risk factors.  I have no -- my family has no liver

20  issues at all whatsoever, and I never had them either.

21  Q    You eventually came to file a lawsuit against USPlabs; is

22  that right?

23  A    I did.  Yes, sir.

24  Q    And that lawsuit got stayed because they got charged with

25  crimes, right?

Quinones - Direct                              18

1  A    Yes, sir, that's --

2  Q    Do you think that the company that made that product that

3  hurt you should stay in business while they're pending trial

4  for the crimes they committed?

5  A    Definitely not.

6           MR. HALL:  Objection.

7           THE COURT:  Sustained.  While I appreciate your

8  opinion as to whether or not they should stay in business, but

9  it's really in the purview of the Court to make that

10 determination and not a particular witness, though I appreciate

11 that.

12          MR. RUNKLE:  Can I try again, Your Honor?

13          THE COURT:  You can, but it --

14 BY MR. RUNKLE:

15 Q    Does it make you feel safe that that company is still out

16 there making product?

17 A    Definitely not.

18 Q    Thank you, Ms. Quinones.

19 A    Thank you.

20          THE COURT:  Cross?

21          MR. HALL:  Thank you, Your Honor.

22          THE COURT:  Just, before you ask a question.

23                  EXAMINATION BY THE COURT

24          THE COURT:  You say that -- the question was, does it

25 make you feel safe knowing that product is still out there?

Quinones - Examination by the Court                19

```
 1   What if they stopped making the product?  Do you have any

 2   problem with the company still being in business?

 3           THE WITNESS:  No.

 4           THE COURT:  Okay.  Questions?

 5           MR. HALL:  Thank you.  Actually, no questions, Your

 6   Honor.

 7           THE COURT:  Thank you.

 8           MR. RUNKLE:  No questions, Your Honor.

 9           THE COURT:  Thank you.  You may step down.

10           THE WITNESS:  Thank you.

11       (The witness steps down.)

12           THE COURT:  May this witness be excused to go to work?

13           MR. RUNKLE:  Yes.

14           THE COURT:  All right.  Thank you, ma'am.  Next

15   witness?

16           MR. RUNKLE:  Next witness is Leanne Sparling, Your

17   Honor.

18           THE COURT:  Ms. Sparling?  Ms. Sparling, if you'd come

19   forward.  Raise your right hand.

20       (The witness is sworn.)

21           THE COURT:  Please be seated.

22                       DIRECT EXAMINATION

23   BY MR. RUNKLE:

24   Q   Good morning, Ms. Sparling.

25   A   Good morning.
```

Sparling - Direct                                    20

1    Q    Could you state your name for the record?

2    A    Leanne, L-E-A-N-N-E, Sparling, S-P-A-R-L-I-N-G.

3    Q    Ms. Sparling, thanks for coming today.

4    A    Thank you.

5    Q    Where are you from?

6    A    Roseville, California.

7    Q    And could you give a little bit of your educational

8    background for the Court?

9    A    Some college.  In the past I've been an EMT and medical

10   assistant.  I'm -- I've been a realtor for the last 17 years.

11   Q    What kind of work do you do?

12   A    Real estate.  Buy, sell, and help buyers and sellers.

13   Q    Okay.  Ms. Sparling, have you ever become aware of a

14   company called USPlabs?

15   A    Yes, I have.

16   Q    How did you first become aware of USPlabs?

17   A    My son was taking a supplement called Jack 3D.  You can

18   either call it Jack3d or Jack 3D.

19   Q    And when did you see him taking Jack3d?

20   A    He graduated --

21            THE COURT:  I'm sorry.  Can you spell -- is it D-A-K?

22            THE WITNESS:  I'm sorry?

23            THE COURT:  How do you spell it?

24            THE WITNESS:  Spell what?

25            THE COURT:  Dak.

1          MR. RUNKLE:  Jack3d.

2          THE COURT:  Did you say Dak?

3          THE WITNESS:  Jack3d.

4          THE COURT:  Jack3d?

5          THE WITNESS:  Yeah.  Jacked or Jack3d.

6          THE COURT:  J-A-C?

7          THE WITNESS:  J-A-C-K 3-D.

8          THE COURT:  Okay.  Thank you.

9          THE WITNESS:  Uh-huh.

10  BY MR. RUNKLE:

11  Q    You saw him taking Jack3d at your house?

12  A    Yes, I did.  Michael graduated from his advanced training

13  on his 22nd birthday.  We brought him home.  And then early in

14  that week he had gone to the store and bought some Jack3d.  And

15  I was in the kitchen making dinner and he was stirring it in a

16  glass and I turned to him and asked him, I said, "What is

17  that?"  And he turns around and he goes, "Mama, look at my

18  muscles."  And I said, "What are you taking?"  And he goes,

19  "Oh, it's Jack3D, Jack 3D."  And I said, "Well, what is that?

20  Does it have steroids in it?"  And he goes, "Mama, I wouldn't

21  be that stupid."  He goes, "This stuff, this is, you know,

22  great.  It's 100 percent natural."  And I asked him where he

23  bought it and he said GNC.

24  Q    What did you think at that time?

25  A    I'm ashamed now, but I thought, oh, okay, that's fine.

Sparling - Direct                                    22

1   Q    So he was in the service?

2   A    He was in the service.

3   Q    He was a private?

4   A    He was.

5   Q    And this is around early 2011?  Does that sound right to

6   you?

7   A    Yes.

8   Q    He went back to Fort Bliss?

9   A    Yes, he did.

10  Q    What happened?

11  A    He went back.  He was in processing.  Met up with his troop

12  on June 1st.  I received a phone call early in the morning that

13  I had missed on my phone.  I had a -- kind of a sick feeling,

14  and so I went and checked my phone and noticed that I had

15  missed a call from Fort Bliss.  There was a voicemail.  And so

16  I got the voicemail and it was his captain at the time saying,

17  "Ms. Sparling, this is Captain Graham.  I need you to call me

18  right away.  Your son has collapsed."

19  Q    And what happened after that?

20  A    I thought to myself, oh, he must have, you know, maybe hurt

21  an ankle or something.  And I called him.  He says, "Ma'am, I

22  need you to talk to the commander of the hospital right now,

23  Dr. Adams."  And he got on the phone.  He says, "Ma'am, your

24  son has collapsed.  He has had a heart attack."  And I went,

25  "What happened?"  And he said, "We're trying to figure it out."

1   And asked me if Michael took any drugs, did he drink, what was

2   he taking?  And I said the only thing that I knew for sure that

3   he was taking was a supplement that he just started called Jack

4   3D.  I told him to please let Michael know that I was on my

5   way, that I would get there as soon as I can.  Sorry, Your

6   Honor.

7            THE COURT:  It's all right.  Take your time.

8            THE WITNESS:  He said, "Ma'am, you don't understand

9   what I'm saying.  Your son is in cardiac arrest and we're doing

10  everything we possibly can to save him."  And I said, "Sir, are

11  you saying that my son is going to die?"  And he says, "Ma'am,

12  you need to pray."

13  BY MR. RUNKLE:

14  Q    You didn't get to see him?

15  A    No, I did not.

16  Q    And what did the doctors at the base think had killed him?

17  A    When we went to the base, I --

18            MR. HALL:  Well, objection as to question calls for

19  speculation, Your Honor.

20            THE COURT:  It does.

21  BY MR. RUNKLE:

22  Q    Did the doctors at the base talk to you about what killed

23  your son?

24  A    Yes, they did.

25  Q    What did they say?

Sparling - Direct                                   24

1          MR. HALL:  Lack of foundation, Your Honor.  I'd like

2     to -- I mean, Exhibit K is the opinion from the district court

3     regarding this lawsuit striking the opinions, and so I would

4     object for lack of foundation as to what these doctors'

5     conclusions are.

6          THE COURT:  Who did you talk to?

7          THE WITNESS:  I talked to the commander of the

8     hospital, Dr. Bruce Adams.

9          THE COURT:  And -- you can go ahead and answer.

10         THE WITNESS:  Okay.  He said that what he felt

11    happened was that the Jack3d, the Jack 3D in his system was

12    what started shutting down his system.  It literally -- how I

13    took it is it was burning him from the inside out.  He said

14    that it caused him to have the heart attack.  See, there wasn't

15    anything that they found in his system.  The only thing they

16    found in there was the Jack 3D and caffeine, that was it, which

17    was in the Jack 3D.  He said that he was the healthiest-looking

18    soldier that had ever crossed his path.  It affected him so

19    badly that he, from what I understand, even observed the

20    autopsy.

21         Michael was very healthy.  He wanted to be healthy.  He

22    wanted to be the best military soldier that he could possibly

23    be.  And he thought by taking the Jack 3D that it would help

24    him become that.

25         Michael -- Your Honor, Michael was smaller than my other

1  two children, and that weighed heavy on his heart, too.  You

2  know, he wanted to be the bigger brother.  And he just, he

3  goes, "I just want to be healthy.  I want to be as fit as I

4  possibly can be."  And that's why he started taking this,

5  because he believed that it was natural.  He told me it was

6  natural.  And I have since found out that it wasn't.  It was

7  synthetic.  It was man-made.  It was made in a factory in

8  China.  You know, this is a -- I'm sorry I'm rambling.  This is

9  a chemical --

10          MR. HALL:  Your Honor, objection.  There's no question

11  pending.

12          THE COURT:  Sustained.

13  BY MR. RUNKLE:

14  Q    So, Ms. Sparling, after that happened, you filed a lawsuit

15  against USPlabs?

16  A    Yes, I did.

17  Q    All right.  And did you contact USPlabs before filing a

18  lawsuit?

19  A    No, I did not.

20  Q    Did -- is it your impression that USPlabs was interested in

21  finding out what actually happened to your son?

22          MR. HALL:  Well, objection as to speculation.

23          THE COURT:  Sustained.

24  BY MR. RUNKLE:

25  Q    What happened in the course of that lawsuit?

1   A   Ultimately, it was -- they felt like I was after money, and

2   at one point offered a deal, but it was never about the money.

3   It --

4   Q   What was it about?

5   A   It was about what they did to my son.  It was what they did

6   to so many other people that I've personally spoken with.

7   Q   So you spoke to other people who had issues with this

8   product?

9   A   Yes.  It became a mission of mine to seek out people.  And

10  people would call me and say, you know, my son or daughter has

11  taken this.  You know, I had gone into a GNC and was

12  questioning the product and asked if they had known of any

13  adverse reaction, and this was -- this part was before I even

14  filed the lawsuit -- and they said, no, you know, they don't

15  know of any adverse effects.  And then he goes, oh, wait a

16  minute, I do know of one.  And I said, "Well, what is that?"

17  And he goes, "Well, I have heard that people have tested

18  positive for meth."  And I said, "Well, that doesn't sound very

19  safe to me."

20  Q   Do you have concerns about the safety of your community

21  because these people are still in operation today?

22  A   Of course I do.  I try to speak out to as many people as I

23  possibly can because -- and who is going to protect us, the

24  consumers?  Everybody is protecting them.  Everybody is

25  protecting the people that killed my son and has hurt so many

 1  people.

 2  Q    Thank you, Ms. Sparling.

 3          THE COURT:  Cross?

 4                      CROSS-EXAMINATION

 5  BY MR. HALL:

 6  Q    Good morning, Ms. Sparling.  My name is Patrick Hall.  I

 7  represent Sitesh Patel.  Have you ever heard that name before?

 8  A    Yes, I have.

 9  Q    You filed lawsuit in the -- on behalf of the estate of

10  Michael in the Western District of Texas, correct?

11  A    Yes.

12  Q    And ultimately that lawsuit was dismissed, correct?

13  A    I dis... yes.

14  Q    All right.  And there was liti... you hired lawyers to

15  represent you and litigate that case, correct?

16  A    Yes, I did.

17  Q    And in that case, they tried to contact experts to reach

18  opinions regarding what caused your son's death, correct?

19  A    Correct.

20  Q    And ultimately the judge struck the opinions of the experts

21  in that case, concluding that that was -- that their opinions

22  were unreliable, correct?

23  A    I don't know if their opinions were unreliable.  They were

24  very reliable to me.

25  Q    Well, you've seen the opinion of the judge, correct?

Sparling - Cross                                28

1   A    Yes, I have.

2   Q    Right.   And the judge specifically said that the doctors'

3   conclusion that what the cause of your son's injury was was

4   Jack 3D was unreliable and he struck that judge's -- or she

5   struck that expert's opinion, correct?

6   A    I think that the report that they reviewed could not say

7   whether or not for sure if it did cause his death or not.   I

8   was always told by the doctors that it did contribute to his

9   death, yes, and that's what I believe.

10  Q    That's what you believe.   But the judge struck the opinion

11  and your suit was dismissed, correct?

12  A    They dismissed it, yes.   They wouldn't hear our --

13  Q    For lack of causation, correct?

14          THE COURT:   She doesn't know that, so ask her for --

15          MR. HALL:   Okay.

16  BY MR. HALL:

17  Q    You said you first -- when your son was first in the

18  hospital you spoke to Dr. Adams; is that correct?

19  A    Yes, I did.

20  Q    And he was the one that told you that we're trying to

21  figure out what happened, correct?

22  A    Correct.

23  Q    And then you later referenced speaking to a doctor at the

24  hospital about what he felt happened.   Was that Dr. Adams as

25  well?

1  A    It was Dr. Adams and also another doctor, and I don't

2  recall his name.

3  Q    All right.  And was that doctor who gave you the opinion

4  about what he felt had happened, was he involved in your civil

5  litigation at all?

6  A    You'd have to ask my attorneys.

7  Q    Was -- well, did you ever follow up with that particular

8  doctor again about his opinion about what he felt happened?

9  A    I've been told that he's retired.

10  Q    Did he tell you what his basis for his conclusions about

11  what he felt happened were?

12  A    What I remember of our conversation, he had come across

13  other patients that had had adverse reactions to Jack 3D.  He

14  also was telling me about rhabdomyolysis, which also happened,

15  which sent off acid throughout his body, shutting down every

16  organ.  That he couldn't even be an organ donor.

17  Q    Were you deposed in connection with the litigation?

18  A    Yes, I was.

19  Q    Now, the Judge or Mr. Runkle asked you some questions about

20  your concerns about the company.  When you're talking about the

21  company, are you talking about USPlabs or are you talking about

22  SK Labs?

23  A    To me, they are both the same.

24  Q    Have you ever done any investigation of what SK Labs does?

25  A    Just through the Internet.

Sparling - Cross                                        30

1   Q   You didn't file a suit against SK Labs, correct?

2   A   No.

3   Q   All right.  And the Internet research that you have done,

4   when did that occur?

5   A   As soon as I got back home from Fort Bliss, I started

6   researching everything I could to find out what happened to my

7   son.

8   Q   All right.  Now, --

9   A   That was the promise I made to him.

10  Q   All right.  Now, you talked about your son taking this.

11  When was it that he started taking this?

12  A   I'm going to say the first week of May.  We came home April

13  30th and he started taking it that next week.

14  Q   The first week of May of 2011?

15  A   Yes.

16  Q   All right.  And do you have any knowledge about what USP is

17  currently making?

18  A   No.

19  Q   Do you have any knowledge about what SK Labs is currently

20  making?

21  A   No.

22          MR. HALL:  Nothing further of this witness, Your

23  Honor.

24          THE COURT:  Thank you.  Any other questions?

25          MR. RUNKLE:  No further questions, Your Honor.

 1              THE COURT:  Thank you, Ms. Sparling.

 2              THE WITNESS:  Thank you.

 3         (The witness steps down.)

 4              THE COURT:  Next witness?

 5              MR. RUNKLE:  Our next witness is Dr. Patty Deuster.

 6              THE COURT:  Dr. Patty--?

 7              MR. RUNKLE:  Deuster, D-E-U-S-T-E-R.

 8              THE COURT:  Thank you.

 9              MR. RUNKLE:  Your Honor, I'd like to ask if Mr. Hall

10  or if Mr. McMullen has any objection to Ms. Sparling watching

11  the remainder of the hearing.

12              THE COURT:  Any objection?

13              MR. HALL:  No objection, Your Honor.

14              THE COURT:  Thank you.

15              MR. MCMULLEN:  No objection, Your Honor.

16              MR. RUNKLE:  Thank you.

17              THE COURT:  Thank you.  Doctor, if you'd raise your

18  right hand?

19         (The witness is sworn.)

20              THE COURT:  Be seated, please.

21                        DIRECT EXAMINATION

22  BY MR. RUNKLE:

23  Q   Good morning.

24  A   Good morning.

25  Q   If you could state and spell your full name for the record,

1   please.

2   A    Spell every -- Patricia Ann Deuster, D-E-U-S-T-E-R.

3   Q    Dr. Deuster, could you give us a bit of an educational

4   history and work history for yourself?

5   A    Educational history, I got my first degree in mathematics,

6   my second degree in education, physical education, my PhD was

7   in nutritional biochemistry and physiology, and I have a

8   master's in public health.

9   Q    And you've worked somewhere since 1982.  Where is that?

10  A    I have.  I've worked at the Uniformed Services University

11  of the Health Sciences, which is the federal health sciences

12  university.  We have a school of medicine, a graduate school of

13  nursing, and a post-graduate dental school.

14  Q    What are your current titles?

15  A    I am a professor in the Department of Military and

16  Emergency Medicine, and I have been there since, as you said,

17  1982.  I'm also the chair of the Department of Defense Dietary

18  Supplements Sub-Committee, and I'm also the director of the

19  Consortium for Health and Military Performance, which is the

20  Defense Center of Excellence for Health and Performance within

21  the Department of Defense.

22  Q    So your job is to keep soldiers healthy, right?

23  A    That's correct.

24  Q    That's you --

25  A    Well, soldiers, sailors, airmen, and marines.

1  Q    And that's what you do every day?

2  A    That's what I do every day.

3  Q    So in your job as chair of the Dietary Supplement -- I

4  forget the full name.

5  A    Dietary Supplement Sub-Committee.  It's actually the

6  Dietary Supplement and Other Self-Care Products Sub-Committee.

7  Q    Okay.  The Dietary Supplement and Other Self-Care Products

8  Sub-Committee.  How long have you had -- have you been in that

9  committee?

10 A    I have been on that committee for about 20 years.  It

11 wasn't formally chartered until about eight or nine years ago,

12 and I have the chair of that since then.

13 Q    Now, before we get to the specific products that are at

14 issue right here, could you talk generally about dietary

15 supplements and the military?

16 A    Well, one of our jobs in the military is to find

17 supplements that are safe and could actually enhance

18 performance.  That's one of -- also, we are supposed to be

19 looking at ones that could potentially cause harm and

20 compromise readiness.  We need them to be able to perform on a

21 dime in very adverse environmental conditions and be ready.

22 Q    Do service members take a lot of dietary supplements?

23 Generally?

24 A    Actually, generally, they take more than the civilian

25 population.  They may be for health, but a lot of them are

1    bodybuilding, weight loss, and performance-enhancing.

2    Q    Have you ever become aware of a company called USPlabs?

3    A    Yes.  I became aware of that company a number of years ago,

4    yes.

5    Q    How did you become aware of it?

6    A    I first became aware of it when a colleague of mine has a

7    son who was in college and he wrote back that he was taking a

8    product called Jack 3D or Jack3d and it made him feel really

9    strange.  And so we got the label and we looked it and I

10   realized that it said USPlabs, which was a concern for me

11   because I know about United States Pharmacopeia, which is also

12   USP.

13   Q    Uh-huh.  And why were you concerned about the product other

14   than the name?

15   A    Because I looked -- we looked at the ingredients.  It had a

16   number of ingredients that were not terribly familiar to me at

17   the time, and it had a combination of ingredients, and we're

18   always concerned when there are multiple ingredients in a

19   dietary supplement.

20   Q    And one of those ingredients purported to be from

21   geraniums, right?

22   A    Well, it said dimethylamylamine, DMAA, from geranium

23   extract, yes, or geranium leaves.  Yes.

24   Q    Okay.  And was it from geraniums?

25   A    I don't think it was from geranium.  I did a literature

1   search and did some background work and found that it had

2   actually been a drug in the 1940s, '50s, called Forthane, and

3   it was for a nasal decongestant.  There were a number of

4   studies in the literature.

5   Q   And you found something about a guy named Patrick Arnold?

6   A   Yes, I found on the Internet that in -- it was in 2005 that

7   Patrick Arnold -- actually, it was Proviant Technologies --

8   wanted to order anywhere from 5 to 25 kgs per month of DMAA.

9   And it didn't say anything about geranium.  It just said DMAA.

10  And it had a list of all the different articles and so on that

11  had been conducted.

12  Q   Okay.  When did you encounter -- and Patrick Arnold is

13  famous --

14  A   From the BALCO.

15  Q   BALCO.

16  A   Yes.

17  Q   (inaudible)

18  A   Designer steroids, yes.

19  Q   So when did you encounter USPlabs again?

20  A   Well, we started seeing lots of different products from

21  USPlabs, but I suppose my next real encounter was when I got a

22  call -- I heard from the military, from the Army, that there

23  had been a death and it was that the young soldier had been

24  taking dimethylamylamine.  I was contacted by the attending

25  physician, and as chair of the Dietary Supplement Sub-

Deuster - Direct                                    36

1   Committee, and also because we had an adverse event working

2   group where we were trying to help people or encourage more

3   physicians and healthcare providers to report adverse events,

4   they contacted me and asked me if I would contact the mother,

5   and that was Leanne Sparling.

6   Q    And did you talk to Dr. Adams?

7   A    Oh, I spoke with him a number of times.  We exchanged

8   emails.  Absolutely.

9   Q    Did any member of your team think that anything other than

10  Jack3d caused this death?

11  A    No.

12  Q    Were there adverse event reports with Jack3d and OxyElite

13  Pro?

14  A    Yes, there were a number of them.  There were a number that

15  we got from the Marines, from the different services, and there

16  was also then another death a couple of months later, the same

17  base, from a woman who was taking OxyElite Pro and some other

18  supplements.

19            THE COURT:  What was she taking?

20            THE WITNESS:  OxyElite Pro.

21  BY MR. RUNKLE:

22  Q    And that's one of USPlabs' products?

23  A    That was a USPlabs product as well, yes.

24  Q    Now, eventually, the military pulled those products from

25  the GNC concessions?

1    A    That's correct.

2    Q    And you were part of that decision?

3    A    I was.  Well, I asked for them to do that.  They did not

4    follow my lead but they eventually came off.

5    Q    Now, there was a safety review commission, a safety review

6    panel that was commissioned?

7    A    Correct.

8    Q    You were part of that?

9    A    I was.

10   Q    Okay.  Now, the Defendants in this case have said that that

11   safety review panel concluded that the deaths were not caused

12   by DMAA.  Is that what the panel concluded?

13   A    I'm guess in a sense they did because it's almost

14   impossible to prove causation, because to get the highest

15   evidence of causation, one, you're supposed to re-challenge.

16   You're supposed to take the person off the supplement and then

17   re-challenge them, and that's really very difficult to do if

18   the person is deceased.  So I think there's a problem with the

19   science.

20   Q    Okay.  But your conclusion was not that it was impossible

21   that DMAA caused this?

22   A    Oh, no.  I thought it was very likely that it had.

23   Q    Okay.  And your -- the panel made other findings; is that

24   right?

25   A    Yes.

1    Q   One of those findings was that people who took DMAA were

2    more likely to have multiple adverse events; is that right?

3    A   That's correct.

4    Q   Do you stand by that finding?

5    A   Absolutely.

6    Q   All right.  In your time on that panel -- how many members

7    of that panel were there?

8    A   Well, there was a group of about 15 of us who met on a

9    regular basis, and then the group at the United States Army

10   Public Health Command at the time, now Center, actually did the

11   epidemiologic work on this study.

12   Q   When you talked to all of those people and, you know, when

13   you look back on this experience, did any of those people in

14   your mind believe that DMAA was safe?

15           MR. HALL:  Objection, Your Honor, as to ambiguous as

16   to what "in your mind" means.

17           THE COURT:  I'll allow it.

18           THE WITNESS:  I think that there were some people who

19   had no knowledge of dietary supplements, and I think that's a

20   general issue throughout the United States.  People don't

21   really understand dietary supplements.  So they didn't know

22   what DMAA was and so they didn't know whether it was safe or

23   not.  At the end of all of the investigation, they were

24   concerned that it should not be in dietary supplements.

25   BY MR. RUNKLE:

1   Q    And has there been other research that you've become aware

2   of about the addiction potential of DMAA?

3   A    There was a paper that came out that showed that it could

4   be addictive, yes.

5   Q    In fact, that paper said that it had 100 percent,

6   potentially, of the addictive capability of cocaine?

7   A    That's correct.  Now, of course, that's very difficult --

8   those studies are very difficult to do, but those were the

9   conclusions, yes.

10  Q    But you weren't done on the USPlabs rollercoaster yet at

11  that time, were you?

12  A    No.

13  Q    What happened next?

14  A    Well, after -- they took OxyElite Pro off, and then they --

15  they have had another one that came on the market.  It was the

16  second version.  And then the third version was with aegeline,

17  and there were a number of liver injuries, and so I

18  participated in that as a member of the Department of Defense

19  with CDC and FDA on that panel as well.

20  Q    That was much more recent, right?

21  A    That was much more recent, yes.

22  Q    And there were service members who were injured by that

23  product?

24  A    There were a number of service members.  I don't have the

25  exact count, but it was anywhere from 20 to 30 to 40, something

1   like that, yes.

2   Q    And in your 30 years of experience working on these issues,

3   could that cluster of injuries have been caused by anything

4   else?

5   A    Not in my mind, no.

6   Q    So what I want to ask you about are untested supplements

7   being put in dietary supplements, right?  Is it possible for a

8   company to put an untested substance in a dietary supplement in

9   the United States?

10  A    Absolutely.

11  Q    It happens all the time?

12  A    It happens all the time.

13  Q    And in fact, the supplement world runs on, hey, this is a

14  new substance that's going to help you, right?

15  A    That's correct.

16  Q    All right.  And so there's nothing preventing a company

17  from saying, hey, we're going to try this substance and see

18  what works, right?

19  A    That's correct.

20  Q    And what you see is a serial -- a series of events where

21  certain substances become more popular, certain -- I'm sorry.

22  Scratch that.  What you've seen is certain substances that you

23  would consider risky substances having spikes of popularity.

24  Is that right?

25  A    That's correct.  But we also have tested lots of products

Deuster - Direct                                    41

1    and we find steroids, stimulants, lots of different stimulants,

2    and actually drugs in the -- when we do the testing.

3    Q    Right.  Are you familiar with prohormones?

4    A    I am.

5    Q    Okay.  What are prohormones?

6    A    A prohormone is a substance that is metabolized into

7    usually, for us, anabolic steroid or testosterone.  So it would

8    be a testosterone analog.

9    Q    And Congress explicitly banned those what I'll call

10   designer prohormones at some point; right?

11   A    That's correct.  In 2014 was the Designer Steroid Control

12   Act, yes.

13   Q    But those substances weren't necessarily legal or safe

14   before then, were they?

15   A    They were never safe, and it's questionable whether they

16   were legal.  They're not really legal.  They're just not

17   necessarily deemed illegal because they haven't been

18   identified.

19   Q    And in your job today, are you monitoring new trends of

20   different types of substances that are now making their way to

21   the market?

22   A    We do our very best to monitor.  It's difficult to keep up

23   with all of it, but we are doing our very best to keep our

24   service members safe.

25   Q    Now, you understand that a company in California called SK

Deuster - Direct                              42

1    Labs produced those products that we talked about earlier?

2    A    Yes, I understand that that's the case.

3    Q    Okay.  Are you concerned about the safety of service

4    members that that company is still in operation while it's

5    pending trial?

6    A    I'm very concerned about it.  Because, again, my job is to

7    try to keep our service members safe and ready for their jobs,

8    and that compromises readiness and the health and safety of our

9    service members.

10   Q    Because there would be nothing preventing them from finding

11   some new substance, hurting more people, and saying, hey, we

12   didn't know that it was going to hurt anybody, right?

13   A    No, and they don't know that it's going to hurt them

14   because they aren't knowledgeable enough, and they hear from

15   their buddies that this works.  And it's a problem.  It's a

16   serious problem.

17   Q    Thank you, Dr. Deuster.

18             THE COURT:  Cross?

19             MR. HALL:  Thank you.

20                      CROSS-EXAMINATION

21   BY MR. HALL:

22   Q    Good morning, Doctor.

23   A    Good morning.

24   Q    Let me start with your investigation regarding Michael

25   Sparling.  Were you summoned as an expert to testify in that

1   case?

2   A    I was not allowed to testify as a federal employee.

3   Q    And you are aware of ultimately what happened in connection

4   with that litigation?

5   A    I am.

6   Q    And you're aware that the judge struck the opinions that

7   had been proffered by the Plaintiff's counsel as unreliable and

8   lacking in proper foundation and scientific method?

9   A    That's my understanding.

10  Q    And have you studied the opinions that those doctors and

11  those experts rendered in that case?

12  A    I think they had the wrong experts, is my professional

13  opinion.   There are a number of people who could have testified

14  that may have changed the outcome.

15  Q    So does that mean that you looked at the opinions that were

16  rendered by the doctors?

17  A    I've looked at a couple of them.   I have not spent a lot of

18  time doing that, no, sir.

19  Q    You talked about you're familiar with the products that SK

20  Labs has manufactured.   What specifically products are you

21  talking about?

22  A    I think we're talking more about ingredients than we are

23  talking about products.

24  Q    All right.   But Mr. Runkle asked you if you're familiar

25  with the products that SK manufactures.   Are you familiar with

1  the products they manufacture?

2  A    No.   I think I -- I thought he had asked about ingredients.

3  People get --

4            THE COURT:   Doctor, I think the real question is, do

5  you know of any product that they are now producing that is

6  harmful to any service person?

7            THE WITNESS:   I can't say, yes, there is a particular

8  product right this minute.   I know there are a number of

9  products out there that I am concerned about.   Can I name them?

10 No, because I have staff that help -- that keep up with all of

11 that.

12 BY MR. HALL:

13 Q   What about if -- what would your thoughts be if -- I mean,

14 you have concerns about -- is it your position that, as Mr.

15 Runkle's position is, that SK Labs should be closed down today?

16 A    I would say absolutely yes, given what's happened in the

17 past.

18 Q   What about if there was some type of monitor in position

19 that could verify the ingredients that were going into all of

20 their products?   Would you have the same concerns?

21 A    Well, I think that the companies that use third-party

22 certification verification, you usually know exactly what's in

23 the product and that the label -- what's stated on the label is

24 in the product.   I don't think that's true of most of the

25 products, because we've analyzed a number of the ones from

Deuster - Direct                                          45

1  USPlabs.

2  Q    So your -- part of your conclusion, though, is based on a

3  presumption that SK Labs does not do independent testing of the

4  ingredients?

5  A    Not by a recognized body like NSF International or USP.

6  Q    What about WADA?

7  A    WADA is not a third-party certifier.

8  Q    But you do understand that they need to be -- have to be

9  screened by WADA to be a member and they have a list of

10 products and ingredients that can be included in products,

11 right?

12 A    I'm well aware of WADA, but, again, it is not a recog... it

13 is not a third-party certifier or verifier like the NSF,

14 Informed-Choice.   There's the Banned Substances Control Group.

15 They actually verify supplements.

16 Q    All right.   So I guess my question goes back to, if there

17 was something in place at SK Labs where all of the ingredients

18 were independently tested or verified as to what their contents

19 were, would that make you -- would you still have the concerns

20 with SK Labs?

21 A    I would, based on history.

22 Q    Thank you very much.

23          MR. RUNKLE:  I have nothing further, Your Honor.

24          THE COURT:  Thank you, Doctor.  You're -- can this

25 witness be excused?

1          MR. RUNKLE:  This witness may be excused.

2      (The witness steps down.)

3          MR. RUNKLE:  Your Honor, does Mr. Hall or Mr. McMullen

4  have any objection to Dr. Deuster staying for the rest of the

5  hearing?

6          THE COURT:  Yes.

7          MR. HALL:  No objection, Your Honor.

8          MR. RUNKLE:  Thank you.

9          THE COURT:  What else for the Government?

10         MR. RUNKLE:  Your Honor, I just have a few -- I have a

11  few additional items.  I wanted to respond to some of the legal

12  points that were made in the responses, if Your Honor will

13  indulge me on that.  I have a presentation that I made up.  I

14  thought it would be easier than filing another brief.  Enough

15  trees have been sacrificed already here.

16      On the legal issues, the Bail Reform Act does not require a

17  clear and convincing showing to set standard conditions of

18  release.  The Court does this every day.  The Act requires a

19  clear and convincing showing only under Subsection F because it

20  reads, "The facts a judicial officer uses to support a finding

21  pursuant to Subsection E that no condition or combination of

22  conditions will reasonably assure the safety of any other

23  person and the community shall be supported by clear and

24  convincing evidence."  Subsection -- that's an explicit

25  reference to Subsection E, which is about detaining the person.

1   We haven't asked for him to be retained.

2       The next legal issue, the Bail Reform Act gives the Court

3   discretion to -- at any time to impose additional or different

4   conditions of release.  We've talked about this already.

5       I also would implore the Court to consider the public

6   interest in the fact that someone who has been indicted twice

7   for this type of behavior is being allowed unfettered business

8   activity in the same realm.

9       The next legal issue that the Defendants raised was whether

10  the Bail Reform Act could apply to a corporation.  SK Labs is,

11  I think we all agree, is a person charged with an offense.  If

12  it can be charged with an offense, it can have conditions of

13  release, because the U.S. Code presumes that business entities

14  are people unless Congress's intent would not be served by the

15  presumption.  The fact that there are certain conditions in the

16  Bail Reform Act that could only be applied to people doesn't

17  make the other conditions that could be applied to corporations

18  not applicable to corporations.

19      The other argument that I make here that I would like the

20  Court to consider is that when Congress wrote a companion

21  statute about DNA sample collection, it used the word

22  individual when it was talking about a person but it didn't

23  change the language about companies.

24      And I just have a few more factual issues that have come up

25  from the responses, and I would like to present the Court with

1    just several small pieces of evidence and then I will sit down.

2        The Defendants in their responses make a representation

3    that Mr. Patel has not been involved in distributing

4    prohormones since 2011.  The text message that we found on Mr.

5    Patel's phone from August 6, 2013, Mr. Patel texted a shipper

6    named Neil Corbin who does work both for USPlabs and SK Labs,

7    and the text message reads, "Crap, got caught --

8            MR. HALL:  I'm going to enter an objection on this,

9    Your Honor.  This is the first time I've seen this.  But

10   certainly I've got questions regarding what the basis for this,

11   what the foundation is, and he's representing that it's on his

12   cell phone, and I have no verification or idea if that's

13   accurate or correct.  And so I certainly object to this.

14           THE COURT:  Thank you.  The objection is overruled.

15           MR. RUNKLE:  All right.  Mr. Hall has -- the text

16   message reads, "Crap, got caught on that fake pro shipment."

17   And I have another document establishing that Mr. Corbin is

18   involved in shipping.  Is it Exhibit 3 -- this document just

19   establishes Mr. Corbin's role, which is to ship products back

20   and forth between USPlabs and SK Labs.  I'm offering this as an

21   attorney proffer, but I don't know what, "Crap, got caught on

22   that fake pro shipment" exactly means, but I believe that "pro"

23   means prohormones and fake is the type of conduct that he was

24   just charged with in the Western District of Virginia where he

25   was making fake shipments where the good stuff would be on the

1   top and the illegal stuff would be on the bottom.  So the idea

2   that he's not involved in these activities today seems remote.

3           THE COURT:  Well, this was in 2013, and my

4   understanding was they made -- Congress passed a law that these

5   prohormones were illegal in 2014.

6           MR. RUNKLE:  Right.  Well, what he -- but the

7   substances were illegal under the Food, Drug, & Cosmetic Act

8   prior to that, right?

9           THE COURT:  I understand that, but this is still three

10  years ago.

11          MR. RUNKLE:  It is still three years ago, Your Honor.

12    And for the question that the Court has asked several times

13  now, I will tell the Court that there have been complaints

14  about USPlabs' products that have been received on MedWatch

15  reports within the last year or two.

16          THE COURT:  Of products that are currently being

17  manufactured?

18          MR. RUNKLE:  Yes.

19          THE COURT:  Okay.

20          MR. RUNKLE:  And as I said, I can --

21          THE COURT:  And tell me about these products.

22          MR. RUNKLE:  I will.

23          THE COURT:  What products?

24          MR. RUNKLE:  The product is the current version of

25  Jack3d.

1          THE COURT:  What's it called?

2          MR. RUNKLE:  One moment, Your Honor.  I'm sorry.

3          THE COURT:  And this is SK or USP?

4          MR. RUNKLE:  This is -- it is a USPlabs product.  We

5   believe that Jack3d is made at SK Labs.

6          THE COURT:  Okay.

7          MR. RUNKLE:  It certainly was made at SK Labs, and Mr.

8   Patel was the originator of the Jack3d formula.

9       The products -- (pause).  I apologize, Your Honor.  I need

10   one moment to find this information.

11      (Pause.)

12          MR. RUNKLE:  There's a complaint about Jack3d on

13   November 29, 2015 that came into the MedWatch system on March

14   8, 2016.  The --

15          THE COURT:  But the complaint was in November of 2015;

16   is that correct?

17          MR. RUNKLE:  That complaint.  Yes, the actual health

18   episode occurred then.  It's the same type of complaint that

19   has happened --

20          THE COURT:  And do we know if this Jack3d was produced

21   -- when it was produced?

22          MR. RUNKLE:  It would have been produced, my

23   understanding is that it has about a -- well, I wouldn't be

24   able to tell you exactly when it was produced.

25          THE COURT:  No, because we don't know if this was Jack

1  3D that he bought from someone or from anywhere else.  So, --

2           MR. RUNKLE:  Well, Jack3d comes from SK Labs, Your

3  Honor.

4           THE COURT:  I understand, --

5           MR. RUNKLE:  Oh, okay.

6           THE COURT:  -- but it could have been an old product

7  that they stopped manufacturing.

8           MR. RUNKLE:  Well, they're still manufacturing Jack3d

9  today.

10          THE COURT:  Right.  And what's in Jack3d now that

11 they're manufacturing that you have concerns about?

12          MR. RUNKLE:  Well, there's a -- it's a -- there's a

13 large amount of caffeine.  There is a substance called arginine

14 nitrate.

15          THE COURT:  That you can find the same thing in No-

16 Doz.  Is that on the market?

17          MR. RUNKLE:  I know.  No, there's a substance, I

18 believe, called arginine nitrate, and the defense counsel can

19 correct me if arginine nitrate is still in Jack3d as we speak.

20 There are a number of formulations, which is part of the

21 problem, is that the defense is -- Defendants are moving

22 targets.

23    Arginine nitrate has been associated, from my knowledge,

24 with brain bleeds that have occurred in some consumers.  And

25 arginine nitrate is not a dietary ingredient that is able to be

1    put in dietary supplements.  It's a -- it's not an amino acid.

2    It is not a -- it's not one of the substances in the list in

3    the Food, Drug, & Cosmetic Act that are the subject --

4              THE COURT:  So, I'm sorry to interrupt you again, --

5              MR. RUNKLE:  Yes.

6              THE COURT:  -- but tell me, is this amino -- or

7    arginine nitrate --

8              MR. RUNKLE:  Arginine nitrate.

9              THE COURT:  -- arginine nitrates currently being

10   placed in the manufacture of Jack3d?

11             MR. RUNKLE:  Well, arginine nitrate was in Jack3d as

12   late as last year, I believe.

13             THE COURT:  All right.  Currently, is there -- is it

14   in Jack3d now?

15             MR. RUNKLE:  I do not know.

16             THE COURT:  Okay.

17             MR. RUNKLE:  As Dr. Deuster said, the concern is that

18   --

19             THE COURT:  The formula.

20             MR. RUNKLE:  -- the formulas change all the time.

21             THE COURT:  Right.

22             MR. RUNKLE:  Right.  And we have no idea what will be

23   in Jack3d tomorrow.

24       That's all I have, Your Honor.  Thank you very much for

25   your indulgence.

1          THE COURT:  Well, tell me what remedy you're asking

2     the Court to impose.

3          MR. RUNKLE:  Okay.  The first remedy is, given the

4     fraud that's in the Sitesh Patel emails that are in the

5     indictments and that I've attached to the motion, we don't

6     believe Sitesh Patel should be in business in the FDA business.

7     There's too much fraud there.  There's too much of a history

8     there.  And it seems to be a very reasonable condition of

9     release for Mr. Patel to avoid the type of conduct that he's

10    been involved in in the past, which is defrauding consumers

11    with dietary supplements that certainly appear that they may be

12    harmful.

13       And I'm not asking the Court to make a factual finding that

14    the products were harmful.  I'm asking the Court to consider

15    the evidence about Mr. Patel.

16       As to SK Labs, there is -- although I think that SK Labs

17    should be shuttered, given its history, a possible alternative

18    remedy would be to order SK Labs to stop doing business with

19    companies of people who have either been convicted of Food,

20    Drug, & Cosmetic Act crimes or are pending trial on Food, Drug,

21    & Cosmetic Act crimes.

22          THE COURT:  You mean SPlabs.  USPlabs.

23          MR. RUNKLE:  Or anybody else.  As the Defendants

24    pointed out, there is a guy named Jared Wheat who is running

25    around selling DMAA or attempting to sell DMAA products and

1  also has prior FDCA convictions.  There are a lot of people in

2  the world who have convictions for doing this type of thing,

3  and it seems like a very reasonable condition of release to

4  order SK Labs to stop doing business with those companies.  I

5  mean, the -- Mr. Geissler has a prior controlled substances

6  conviction in the state of Texas also.  That seems like a very

7  reasonable condition of release that would be applied -- could

8  be applied to any defendant.  So that would be my alternative

9  request, Your Honor.

10        THE COURT:  How can we stop them from just changing

11  their corporate name and doing business with someone that's not

12  under indictment, --

13        MR. RUNKLE:  Well, we can --

14        THE COURT:  -- doing the same thing?

15        MR. RUNKLE:  Well, we can write the order to cover

16  their --

17        THE COURT:  Well, it's almost like thought police

18  here.

19        MR. RUNKLE:  No, I don't think it's thought police.  I

20  think that there's a -- they stop doing business with companies

21  or people who are either pending trial for or have been

22  convicted of Food, Drug, & Cosmetic Act related crimes.

23        THE COURT:  Got you.  Can you delineate those

24  companies that they're doing business with that are currently

25  under indictment or have been convicted of crimes?

1          MR. RUNKLE:  Well, there's -- they've done business

2    with --

3          THE COURT:  We know USPlabs.

4          MR. RUNKLE:  Yes, USPlabs.  Willie Gomez seemed to be

5    a favorite of Sitesh Patel.  Willie Gomez is now under

6    indictment in the Western District of Virginia.  And if the

7    Court orders SK Labs to provide us with a list of their

8    clientele, we can do research and determine which ones of them

9    have been convicted or are pending trial for Food, Drug, &

10   Cosmetic Act related crimes.

11         THE COURT:  Okay.  Thank you.

12         MR. RUNKLE:  Thank you, Your Honor.

13         THE COURT:  For the Defense?

14         MR. HALL:  Thank you, Your Honor.  On behalf of Mr.

15   Patel, let me start with kind of reverse order here.  The

16   product, the Jack3d product that is referenced in this November

17   29, 2015 complaint, if it contains arginine nitrate, it was not

18   manufactured at SK Labs.  That is something that USP uses

19   multiple manufacturers, I believe, at this point in time for

20   Jack3d, and if it contains that, that's not something that came

21   within the past three, four, five years from SK Labs.

22         THE COURT:  Okay.

23         MR. HALL:  The current version of Jack3d contains

24   caffeine, an entirely legal product, but not this arginine

25   nitrate.

1          Your Honor, I have a whole bunch of comments here --

2              THE COURT:  Okay.

3              MR. HALL:  -- about the Government's case, but I would

4      prefer to cut to the chase and get to the very bottom of what

5      the Court's concerns are, and start out with Mr. Patel is very

6      serious about this case.  The inferences that have been drawn

7      by Mr. Runkle from his lack of apparent communication with the

8      prosecutors is he's -- you know, there are certainly some

9      hotly-contested issues in this case, including causation, as

10     claimed by this doctor for whom I had no notice of, all right,

11     and I certainly didn't do a great job of cross-examining her

12     regarding her tests and foundations, but we don't have any of

13     that expert evidence before me.

14         But today what I want to do is propose to the Court

15     something that assures the Court that Sitesh Patel is not out

16     there violating the law and is not committing ongoing crimes.

17     And we started with and we emphasize that there was a current

18     audit done.  Mr. Lassiter and his assistant, Mr. Guo

19     (phonetic), who performed that audit, are both present in court

20     today to talk about that, if the Court has questions about that

21     particular audit.  But this isn't the first time that they've

22     been audited.  This is actually the second audit.  So, before

23     any of these allegations, you know, any of these indictments

24     occurred, SK was concerned about their manufacturing processes

25     and had engaged them back in 2015 to do a similar type of study

1   to assure it.

2       The most recent study that you have before Your Honor as

3   Exhibit D in our pleadings is actually the study that was

4   requested and the evaluation requested by us to assure the

5   Court that they're not currently violating the law or

6   distributing products that are a danger to the community.

7       We hotly contest the issue of danger to the community.  Ms.

8   Sparling testified today, but there really is no causation link

9   there, and the judge thoughtfully and, after reviewing lengthy

10  depositions of the experts and cross-examination, came to the

11  conclusion that that -- that there was unreliable opinion.  And

12  Dr. Deuster, if I have her name correct, concludes that maybe

13  they used the wrong experts.  But in this instance, Your Honor,

14  the evidence in that case is that there was no causation.

15      We would -- I'd like to emphasize a couple of things about

16  this indictment in the Western District of Virginia.  And when

17  Your Honor asked the question, I think you hit it on the head,

18  is that when you first read this motion it looks like Mr. Patel

19  is out there committing violations while he's on bond in this

20  case, and that's a -- a rebuttable presumption arises at that

21  point in time, I believe, under the Act.  This is not the case.

22  This is, in fact, conduct that precedes, really, what's at

23  issue here in this USP, what I call the USP indictment.

24      And so it's older conduct, and we're not taking it lightly

25  and he's not taking it lightly.  And so what we want to do is

1    satisfy the Court that he doesn't lose his career that he came

2    out.

3         So, as Your Honor has read, I'm sure, he left Rutgers and

4    began working for his father, and in the first three years was

5    involved in this industry after he got his doctorate in

6    pharmacy.  Almost all of the emails that the Government has

7    referenced involve those first three years, although I'm seeing

8    something today, a text message, which we dispute that that

9    "pro" means anything as Mr. Runkle has it interpreted.  Pro is

10   a term of art used in the industry to talk about tracking

11   records.  But in any event, we dispute that there's any recent

12   conduct, certainly nothing since 2013.

13        And so from 2013 to present, there is actually no evidence

14   before the Court of anything illegal going on at SK.  And what

15   I want to do is, frankly, just open up to whatever questions

16   Your Honor has to satisfy Your Honor that Mr. Patel is not out

17   there committing violations.

18        Mr. Lassiter is here.  He's willing to go forward and serve

19   as a monitor for the Court.  We've talked to him about giving

20   reports back to the Court about what's ongoing with SK, to

21   assure that there's no ongoing problems there.  And we would

22   ask that Mr. Patel, who is now an integral part with respect to

23   the company -- he is now a vice president.  He wasn't vice

24   president back when he first stated.  He is now a vice

25   president, and we ask that he be given the opportunity to

satisfy the Court through this monitor.  In other words, have

Mr. Lassiter act as the Court's eyes and ears and go back and

independently verify.  He's not a high-priced -- I think Mr.

Runkle's explanation was he's a high-priced expert.  At this

point, he's here to audit.  He's been picked in the past.  He's

certainly got the credentials to conduct this type of audit.

And we want to assure the Court that there's nothing untoward

going on at SK, or certainly nothing untoward occurring by

Sitesh Patel.

All of these allegations relate to old conduct.  There's

nothing new except for this one complaint, and we dispute it at

2015.  There's nothing new.  And we simply want to emphasize to

the Court that this isn't an instance where someone has done

something while they're out on bond.

And for that reason, Your Honor -- so I invite Your Honor

to pose questions to me regarding what it would do to satisfy

Your Honor to make sure that he's not out there committing, you

know, that he's not a danger to the public.

THE COURT:  Thank you.

MR. MCMULLEN:  Your Honor, could I add one point as to

SK?  There's an overlap in the issues as to most of those

points.  However, there's one thing that I think should be

pointed out, and it came at the very end of Dr. Deuster's

testimony, and that when the Court and Mr. Hall were inquiring

as to her knowledge of what's been going on at SK Labs after

1    2013, there was some discussion about what organizations would

2    be appropriate to determine whether they're providing the right

3    products or good products in the market, and there was a

4    discussion of WADA.

5            THE COURT:  Right.

6            MR. MCMULLEN:  Dr. Royster herself at that point

7    mentioned as one of the approved organizations that would be

8    reliable as --

9            THE COURT:  I'm sorry, who?

10           MR. MCMULLEN:  Dr. Royster just now mentioned

11   Informed-Choice.

12           THE COURT:  Deuster.

13           MR. MCMULLEN:  Deuster.  I'm sorry.  Dr. Deuster

14   mentioned Informed-Choice as someone that she would find

15   reliable.  And what's important here, and this was provided in

16   Exhibit C to SK Labs' response, is that that's exactly what SK

17   Labs did.  They sought out a review by Informed-Choice.  Put in

18   the papers what that review involved.  It involved an on-site

19   visit.  It involved swabs being taken.  And they maintained

20   that registration status with that organization until the

21   indictment was filed in the case, at which point, and the

22   letter that I provided to the Court, is that the only reason

23   that they lost that status from Informed-Choice was as a result

24   of the indictment and nothing else.  And so I think that that

25   is an indication that the Government's own witness has

1 identified an organization that found that -- that would be an

2 appropriate way to know that what the company is doing now is

3 okay and they did comply with the, in the past, the

4 registration requirements of that organization.

5      THE COURT:  So what you're throwing to me is the

6 possibility of imposing that as a condition, is having

7 Informed-Choice continue to monitor the activities at SK Labs?

8      MR. MCMULLEN:  Your Honor, I don't think that I can do

9 that.  I think that the best next alternative is to provide

10 someone --

11      THE COURT:  No, but I can do that.

12      MR. MCMULLEN:  -- who is going to do it.

13      THE COURT:  So are you saying that that's something

14 that you'd agree to or that's a condition you could live with

15 or --

16      MR. MCMULLEN:  Your Honor, this is the issue.  The

17 letter that was provided by Informed-Choice in response to the

18 indictment is very strongly worded, in which they said, look,

19 we have our own necessity as our organization to protect our

20 own reputation, and because you've been indicted, you're out.

21 We're not going to be involved with you.

22      THE COURT:  Okay.

23      MR. MCMULLEN:  So I don't think that they would be

24 willing to be involved in our organization anymore, but solely

25 as a result of the indictment, notwithstanding SK passing all

1  the test requirements.

2          THE COURT:  Thank you.

3          MR. MCMULLEN:  Thank you, Your Honor.

4          MR. RUNKLE:  I just have a few responses to that, Your

5  Honor.

6      The first is that, obviously, if we believe that they were

7  committing crimes right now in violation of the pre-trial

8  release, we would be seeking detention.  That's not what we're

9  seeking.  We're seeking a very measured response to what we

10  think is a need that's out there.  The public needs to be

11  assured that these companies are not continuing the same

12  conduct.

13      The second response that I have generally to Mr. Hall and

14  Mr. McMullen is that they haven't sought to explain in these

15  audits the problem of the fraud that Mr. Patel committed both

16  on the company and on consumers.  So, as an example of what

17  happened, USPlabs wanted SK Labs to use a new substance called

18  cynanchum auriculatum in the last formulation of OxyElite Pro.

19  That substance, Jacob Geissler agreed with the Chinese supplier

20  that what they were actually having shipped to the United

21  States was not cynanchum auriculatum extract but it was just

22  the ground up plant of cynanchum auriculatum, which wouldn't

23  have any of the properties of the concentrated extract.  It

24  wouldn't actually have the active ingredient.  And so that new

25  substance, there's no way to test it.  There's no reference

1   standard.  That's the problem with these audits.

2       So when that fraud occurred, they go, hey, we have this new

3   substance, it's a plant extract, let's put it in OxyElite Pro.

4   And there's no way to handle that kind of conduct in what these

5   audits are doing unless they're prohibited from using certain

6   ingredients or new ingredients or unless these audits are doing

7   new dietary ingredient checks to make sure that nothing there

8   is something that there isn't a reference standard for and

9   isn't being tested every day.  And I just have no confidence

10  that that will actually accomplish that.

11          THE COURT:  So even if we do audits on a regular

12  basis, if they keep adding new ingredients, there's no way to

13  keep that from happening?

14          MR. RUNKLE:  It depends on what the ingredients are.

15          THE COURT:  Right.

16          MR. RUNKLE:  And these companies love to use new,

17  wham-bang, hey, here's this extract that's going to, you know,

18  help you lose weight and grow hair, you know, whatever it is,

19  right?  And so that's the fundamental problem.  And that's the

20  fundamental problem that Mr. Patel has -- he's engaged in fraud

21  and his co-conspirators have engaged in fraud in exactly that

22  area, about the identities of these ingredients.  And, you

23  know, the value-added thing about cynanchum auriculatum is that

24  Jacob Geissler knew that it could have liver toxicity

25  associated with it.  Now, I don't think they put enough of it

1    in the product to actually hurt people's livers, but it was a

2    fraud coming and going, and it affects the safety of the

3    community when that kind of activity is going on.  And I don't

4    believe these audits can properly handle that unless the audits

5    are so stringent that they are -- that they're prohibiting the

6    uses of those types of ingredients.

7         Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. HALL:  Your Honor, may I response to his -- that

10   point?

11             THE COURT:  Yes.

12             MR. HALL:  Thank you.  Your Honor, there is -- that's

13   inaccurate about the product, all right?  They can test for new

14   ingredients.  It's done.  It's sent out to an outside service.

15   It can be tested.  And so there is a way to monitor these types

16   of activities, and it doesn't depend at all on what the

17   representation of Mr. Sitesh Patel or anyone else is.  It's an

18   independent analysis of the substance that comes in.  It's done

19   according to the general manufacturing practices and

20   procedures.  Mr. Lassiter, we've spoken with him regarding

21   this, and there's testing done when any new product comes in,

22   so new -- any new ingredient arrives, and so it's --

23             THE COURT:  Well, what about the old product where

24   they change the formula?

25             MR. HALL:  Well, if they're changing the formula and

1    they're adding a new ingredient, then it's still a new

2    ingredient that they can test.  And so we certainly --

3            THE COURT:  That's encompassed by the audit as well?

4            MR. HALL:  That certainly can be encompassed by such

5    an audit, Your Honor.

6            THE COURT:  Uh-huh.  What else?

7            MR. HALL:  That's it.  Thank you, Your Honor.

8            THE COURT:  Thank you.

9        All right.  I'll take this matter under advisement.  I'll

10   try to get a decision out rather quickly.

11       Any other matters for the Government?

12           MR. RUNKLE:  Nothing else, Your Honor.

13           THE COURT:  For the Defense?

14           MR. HALL:  No, Your Honor.

15           MR. MCMULLEN:  No, Your Honor.  Thank you.

16           THE COURT:  Thank you.  We stand adjourned.

17       (Proceedings concluded at 10:19 a.m.)

18                           --oOo--

19

20                         CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
22   entitled matter.

23    **/s/ Kathy Rehling**                        **09/08/2016**

24   _____     _____

25   Kathy Rehling, CETD-444                      Date
     Certified Electronic Court Transcriber

1

                                INDEX

PROCEEDINGS                                                        3

WITNESSES

Government's Witnesses        Direct  Cross  Redirect  Recross  Court

   Yamira Quinones              13                                  18
   Leanne Sparling             19     27
   Patty Deuster               31     42


EXHIBITS

-none-

RULINGS - Taken Under Advisement                              65

END OF PROCEEDINGS                                            65

INDEX                                                         66

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25